# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD

JEAN A. MATIAS,
                 Appellant,

        v.

DEPARTMENT OF HOMELAND
   SECURITY,
                Agency.

DOCKET NUMBERS
SF-1221-13-0178-W-2
SF-1221-13-0493-W-1

DATE: April 14, 2015

## THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Jean A. Matias, Honolulu, Hawaii, pro se.

Jessica A. Neff, Washington, D.C., for the agency.

Reagan N. Clyne, Springfield, Virginia, for the agency.

### BEFORE

Susan Tsui Grundmann, Chairman
Mark A. Robbins, Member

### FINAL ORDER

¶1 The appellant has filed a petition for review of the initial decision, which denied her request for corrective action in these joined individual right of action (IRA) appeals. Generally, we grant petitions such as this one only when: the

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. See 5 C.F.R. § 1201.117(c).

initial decision contains erroneous findings of material fact; the initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case; the judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case; or new and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. *See* Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115). After fully considering the filings in this appeal, and based on the following points and authorities, we conclude that the petitioner has not established any basis under section 1201.115 for granting the petition for review. Therefore, we DENY the petition for review. Except as expressly MODIFIED by this Final Order to find that the appellant's disclosure number 15 was protected, we AFFIRM the initial decision.

## BACKGROUND

¶2 Beginning in April 2007, the appellant served as the GS-15 Assistant Special Agent in Charge (ASAIC) of the U.S. Secret Service's Honolulu field office (HFO). *Matias v. Department of Homeland Security*, MSPB Docket No. SF-1221-13-0178-W-1, Initial Appeal File (IAF1), Tab 5, Vol. 3 at 384. Her direct supervisor was A.J., Special Agent in Charge (SAIC) of the HFO, her second-level supervisor was C.M., Deputy Assistant Director (DAD) of the Office of Investigations (INV),[2] and her third-level supervisor was M.M., Assistant Director (AD) of the INV.[3] *Id.*, Vol. 2 at 10; IAF1, Tab 8, Vol. 6,

---

[2] C.M. was DAD of the INV from July or August 2008 until 2010, when he transferred to the position of DAD of the Office of Strategic Intelligence and Information (OSII). Hearing Transcript (HT) at 55. Effective February 10, 2013, he was reassigned to the position of Assistant Director (AD) of the OSII. *See* IAF1, Tab 12 at 96.

[3] Effective October 25, 2010, M.M. was reassigned to the position of AD of the Office of Administration (ADM). *See* IAF1, Tab 8, Vol. 6, Agency File, Part 3 at 56.

Agency File, Part 3 at 57; HT at 55.  In 2008 and 2009, the appellant reported to C.M. that A.J. had engaged in "malfeasance, violation of Federal law and harassment."  IAF1, Tab 5, Vol. 2 at 10.  Based on the reports of the appellant and other HFO employees, C.M., with M.M.'s concurrence, assigned two SAICs to conduct a fact-finding investigation involving personnel assigned to the HFO.  IAF1, Tab 8, Vol. 6, Agency File, Part 4 at 35; HT at 79.

¶3      From January 5-8, 2009, the SAICs conducted 30 interviews in Honolulu in support of the investigation.  IAF1, Tab 8, Vol. 6, Agency File, Part 4 at 35.  During her interview on January 5, 2009, the appellant reported, inter alia, that: the HFO had 10 revolving memberships at a private gym where A.J. exercised every day even though there was a gym in the HFO, *id.* at 43; A.J. saw no value in ensuring that Special Agents (SAs) could access Hawaii Department of Motor Vehicles (DMV) records directly from the HFO, stating that they could obtain the same information by going to the DMV, *id.*; and Foreign Service Nationals (FSNs) were using government-owned vehicles (GOVs) for their home-to-work (HTW) transportation, *id.* at 45.  The appellant also told the fact-finders that A.J. was too old (68 years old), was born on a pineapple plantation, and "need[ed] to go."  *Id.* at 47.  In addition, she disclosed that she had taken money from the Confidential Fund to provide travel advances to agents because no one with authority to issue drafts was available.  *Id.*

¶4      Following the investigation, the appellant bid on and was selected for a lateral reassignment to the GS-15 position of ASAIC of the INV's Criminal Investigative Division (CID) in Washington, D.C., to be effective August 30, 2009.[4]  IAF1, Tab 8, Vol. 6, Agency File, Part 4 at 18, 29.  The appellant asked to be excused from that position when she was unable to sell her home in Honolulu

---

[4] The record indicates that the position was open for bid from February 26, 2009, to March 12, 2009.  IAF1, Tab 8, Vol. 6, Agency File, Part 4 at 28-29.  On April 14, 2009, the agency announced that the appellant had been selected for the position.  *Id.* at 17-18.

without taking a substantial loss. IAF1, Tab 5, Vol. 2 at 50; HT at 453-54. By then, however, her position as ASAIC of the HFO had been filled by someone else. IAF1, Tab 5, Vol. 2 at 50; HT at 454-55. With the agency's assistance, in January 2010, the appellant obtained a GS-15 position at the Hawaii Department of Homeland Security State and Local Fusion Center (Fusion Center) in Honolulu. IAF1, Tab 5, Vol. 2 at 50; HT at 455-60.

¶5    In the meantime, C.M. issued a memorandum dated August 14, 2009, advising the appellant of his decision to suspend her for 1 day, effective August 21, 2009, for Unauthorized Use of Confidential Funds and Making Inappropriate Comments. IAF1, Tab 5, Vol. 2 at 157-58. On August 18, 2009, the appellant filed an administrative grievance of her suspension, which was denied by P.M., AD of the Office of Protective Research,[5] on November 23, 2009. *Id.* at 160-63.

¶6    On December 4, 2009, the appellant filed a complaint with the Office of Special Counsel (OSC) alleging that the agency had suspended her for 1 day in reprisal for whistleblowing and for filing a grievance of the suspension. *See* IAF1, Tab 5, Vol. 2 at 98. After exhausting her remedies with OSC, the appellant filed an IRA appeal with the Board, which was dismissed as settled in an initial decision.[6] *Matias v. Department of Homeland Security*, SF-1221-10-0588-W-1, Initial Decision (June 29, 2010) (suspension ID); *see* IAF1, Tab 8, Vol. 6, Agency File, Part 4 at 6-8 (copy of the settlement agreement).

¶7    Thereafter, the appellant expressed interest in other positions, but she was not selected for them. *See, e.g.*, IAF1, Tab 5, Vol. 3 at 454-57 (September 9, 2011 email from the appellant expressing interest in the GS-15 positions of

---

[5] P.M. subsequently served as AD of the Office of Government and Public Affairs (GPA) from October 9, 2011, until February 10, 2013, when he was reassigned to the position of AD of the INV. *See* IAF1, Tab 8, Vol. 6, Agency File, Part 3 at 101, Tab 12 at 96.

[6] That decision became the Board's final decision on August 3, 2010, when neither party filed a petition for review. Suspension ID at 2.

Resident Agent in Charge (RAIC) of the London resident office and ASAIC of the Rome field office), 458-62 (December 28, 2011 email announcing the selectees for those positions). On January 6, 2012, the appellant applied for the Department of Homeland Security (DHS) Fellows Program, a leadership development program, *id.* at 356-63, but she was not selected to participate, *see id.* at 366-67.

¶8        On March 1, 2012, the appellant filed a complaint with OSC alleging that she was reassigned to the Fusion Center and was not selected for promotion to a Senior Executive Service (SES) position,[7] reassignment to other GS-15 positions, or participation in the DHS Fellows Program in reprisal for her disclosures in 2008 and 2009, her August 2009 grievance, and her Board appeal. IAF1, Tab 8, Vol. 5, Agency File, Part 2 at 4-26. In the appellant's November 26, 2012 response to OSC's November 9, 2012 letter advising her of its preliminary determination to close its inquiry into her allegations, she identified the following 16 disclosures:

    (1)    A.J. nicknamed her "Madame Bulldog";

    (2)    A.J. permitted illegal/improperly staffed applicant panel interviews in violation of Secret Service policy;

    (3)    A.J. allowed for the payment of an undercover telephone line without a telephone attached for 10 years;

    (4)    A.J. allowed for an unmonitored/excessive HFO annual utility bill of $66,608.21, which the appellant reduced to $12,289 for Fiscal Year 2008;

    (5)    A.J. placed a performance expectation letter in an employee's personnel file without the approval of the Secret Service's employee relations branch;

---

[7] The Office of Personnel Management certified the appellant as eligible for an SES position on December 30, 2008. *See Matias v. Department of Homeland Security*, MSPB Docket No. SF-1221-13-0493-W-1, Initial Appeal File (IAF2), Tab 19 at 4; HT at 9.

(6)  A.J. had a private gym membership paid for by the Secret Service and he left work early every day to exercise there;

(7)  A.J. denied the purchase of search warrant breaching tools, which caused delays, downtime and distraction from the Secret Service's mission, resulting in a lack of efficacy and efficiency;

(8)  A.J. denied SAs access to the Hawaii Driver's License System, stating that computer access to drivers' license information was unnecessary, as there were other investigative tools available and SAs could go to the DMV for the information;

(9)  12 of the HFO's 21 official Secret Service vehicles were not equipped with police lights/siren packages for emergency/response purposes;

(10)  The HFO regularly engages in excessive official travel to destinations that are farther from Hawaii and closer to Europe, New York, or Chicago, resulting in the purchase of business-class airline tickets, excessive travel, and excessive overtime expenses.  The HFO's district lines require reevaluation;

(11)  A.J. failed to discipline an SA assigned to the Federal Bureau of Investigation (FBI) Joint Terrorism Task Force who did not participate in any HFO cases or perform other duties for the Secret Service;

(12)  A.J. failed to have the HFO's administrative personnel properly cross-trained with the appropriate authority and access;

(13)  A.J. allowed the HFO's Administrative Officer to dispense confidential funds in the absence of the Confidential Fund Cashier and the Assistant Confidential Fund Cashier, which is a violation of Secret Service policy;

(14)  A.J. misused his GOV by using it to go shopping once a week;

(15)  A.J. gave foreign nationals working for Secret Service offices in Hong Kong and Bangkok official Secret Service vehicles for their daily commute to work.  This is a violation of federal law;

(16) A.J. used derogatory names when referring to FBI supervisors (male and female) and to the female Health and Human Services (HHS) supervisor.

*Id.*, Agency File, Part 1 at 114-16, 135-38.

¶9 On November 28, 2012, OSC terminated its inquiry into the appellant's allegations and issued her a closure letter and notice of Board appeal rights. IAF1, Tab 8, Vol. 5, Agency File, Part 1 at 111-12. The appellant timely filed an IRA appeal on January 8, 2013, and requested a hearing. IAF1, Tab 1.

¶10 On January 25, 2013, the agency announced appointments to six SES positions; however, the appellant was not one of the appointees. IAF1, Tab 12 at 96-97. The appellant filed another OSC complaint on March 7, 2013, alleging that she was not selected for any of the SES positions announced on January 25, 2013, in reprisal for her disclosures. *Id.* at 81-95. In light of the appellant's new OSC complaint, the administrative judge issued a March 27, 2013 initial decision dismissing her IRA appeal without prejudice to refiling, noting that the parties agreed that the personnel actions at issue in the appellant's appeal[8] and her new OSC complaint should be adjudicated together for administrative efficiency. IAF1, Tab 16. On May 3, 2013, OSC issued a closure letter regarding the appellant's March 7, 2013 complaint. IAF2, Tab 1 at 11. On May 21, 2013, the appellant filed an IRA appeal with the Board and requested a hearing. *Id.* at 3. The same day, she refiled her January 2013 IRA appeal. *Matias v. Department of Homeland Security*, MSPB Docket No. SF-1221-13-0178-W-2, Refiled Appeal

---

[8] These personnel actions are the appellant's assignment to the Fusion Center in January 2010, her nonselection for participation in the 2012 DHS Fellows Program, and her nonselection for the following positions between December 2010 and September 2012: (1) SES SAIC of the HFO in December 2010, IAF1, Tab 5, Vol. 3 at 432; (2) GS-15 RAIC of the London resident office in December 2011, *id.*, Vol. 4 at 458, 460; (3) GS-15 ASAIC of the Rome field office in December 2011, *id.* at 458, 462; (4) SES SAIC of the Technical Security Division (TSD), Office of Technical Development and Mission Support (TEC) in August 2012, IAF1, Tab 8, Vol. 5, Part 2 at 54; (5) SES SAIC of the HFO in August 2012, *id.*; (6) GS-15 ASAIC of the Rome field office in September 2012 , IAF1, Tab 8, Vol. 5, Part 2 at 66; and (7) GS-15 Deputy SAIC of the Chicago field office in September 2012, *id.* at 65; *see* IAF1, Tab 11 at 5, Tab 12 at 9.

File (RAF), Tab 1. The administrative judge joined the two appeals. IAF2, Tab 26.

¶11 Following a hearing, the administrative judge issued an initial decision in which she found that the Board has jurisdiction over the joined appeals but denied the appellant's request for corrective action. RAF, Tab 21, Initial Decision (ID) at 2. The administrative judge found that disclosures (2), (6),[9] (11), (13), and (14) were protected, but not the remainder, ID at 16-29, and that the appellant had proved by preponderant evidence that her disclosures were a contributing factor in each personnel action at issue, ID at 29-32. However, the administrative judge found that the agency proved by clear and convincing evidence that it would have taken the same personnel actions in the absence of the protected disclosures. ID at 32-51.

¶12 On petition for review, the appellant challenges the administrative judge's findings that several of her disclosures were not protected, Petition for Review (PFR) File, Tab 1 at 8-12, and that the agency proved by clear and convincing evidence that it would have taken the same actions in the absence of her whistleblowing activity, *id.* at 12-20. She also contends that the fact-finding investigation was improper, *id.* at 5-6, and that the administrative judge improperly denied her witness requests, *id.* at 9, 14-17. The agency has filed a response in opposition to the petition for review. PFR File, Tab 2.

## ANALYSIS

¶13 In an IRA appeal, after establishing the Board's jurisdiction,[10] the appellant then must establish a prima facie case of whistleblower retaliation by proving by

---

[9] As indicated above, this disclosure consists of the following two statements regarding A.J.: (1) he had a private gym membership paid for by the Secret Service; and (2) he left work early every day. IAF1, Tab 8, Vol. 5, Agency File, Part 1 at 115. The administrative judge found that only the second statement was a protected disclosure. *See* ID at 20-21.

[10] We discern no reason to disturb the administrative judge's finding that the appellant established jurisdiction over these appeals. *See* ID at 2.

preponderant evidence that: (1) she made a disclosure described under 5 U.S.C. § 2302(b)(8) or engaged in protected activity described under 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D); and (2) the disclosure or protected activity was a contributing factor in the agency's decision to take or fail to take a personnel action as defined by 5 U.S.C. § 2302(a). 5 U.S.C. § 1221(e)(1); *Webb v. Department of the Interior*, 122 M.S.P.R. 248, ¶ 6 (2015). If the appellant meets that burden, the Board shall order such corrective action as it considers appropriate unless the agency shows by clear and convincing evidence that it would have taken the same personnel action in the absence of the protected disclosure. 5 U.S.C. § 1221(e)(1)-(2); *Chambers v. Department of the Interior*, 116 M.S.P.R. 17, ¶ 12 (2011). Clear and convincing evidence is "that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established." 5 C.F.R. § 1209.4(d).

<u>The appellant made protected disclosures.</u>

¶14    A protected disclosure is a disclosure that an appellant reasonably believes evidences a violation of any law, rule or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. 5 U.S.C. § 2302(b)(8)(A); *Chambers v. Department of the Interior*, 515 F.3d 1362, 1367 (Fed. Cir. 2008). A reasonable belief exists if a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the appellant could reasonably conclude that the actions of the government evidence one of the categories of wrongdoing listed in section 2302(b)(8)(A). *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999). To establish that she made a protected disclosure, the appellant need not prove that the matter disclosed actually established one of the types of wrongdoing listed under section 2302(b)(8)(A); rather, she must show that the matter disclosed was one which a reasonable person in her position would have believed evidenced any of the situations specified in 5 U.S.C. § 2302(b)(8). *Chavez v. Department of Veterans Affairs*, 120 M.S.P.R. 285, ¶ 18 (2013).

¶15 As noted above, the administrative judge found that the appellant proved by preponderant evidence that the following disclosures were protected: all of disclosures (2), (11), (13), and (14), and a portion of disclosure (6) pertaining to A.J.'s work schedule. ID at 16-17, 21, 26-27. The agency has not filed a cross petition for review contesting the administrative judge's findings regarding these disclosures. The appellant does not challenge on review the administrative judge's finding that she failed to prove by preponderant evidence that disclosure (3) was protected. ID at 18. Thus, we will limit our discussion to the remaining disclosures.

¶16 Disclosures (1) and (16) involve A.J.'s alleged remarks about the appellant (disclosure (1)) and employees of other agencies (disclosure (16)). *See* IAF1, Tab 8, Vol. 5, Agency File, Part 1 at 115-16. Regarding disclosure (1), the administrative judge found that the appellant did not disclose an abuse of authority when she informed C.M. and the fact-finders that A.J. had nicknamed her Madame Bulldog. ID at 16 (citing IAF1, Tab 5, Vol. 2 at 155, 194). An abuse of authority occurs when there is an arbitrary or capricious exercise of power by a federal official or employee that adversely affects the rights of any person or that results in personal gain or advantage to himself or to preferred other persons. *Chavez*, 120 M.S.P.R. 285, ¶ 22. We agree with the administrative judge's finding that a disinterested observer could not reasonably conclude that A.J. calling the appellant Madame Bulldog constituted an arbitrary or capricious exercise of power that adversely affected her rights. ID at 16. As the administrative judge noted, A.J. did not threaten the appellant's career or take any other unwarranted actions against her, and the appellant did not describe the context or circumstances surrounding the remark. ID at 16. Thus, although A.J. may have behaved unprofessionally by referring to the appellant as Madame Bulldog, the appellant failed to prove that a disinterested observer could reasonably conclude that A.J.'s use of this nickname constituted an abuse of his authority.

¶17      As for disclosure (16), we agree with the administrative judge that the appellant did not prove by preponderant evidence that she reasonably believed that A.J.'s use of derogatory names to refer to employees of other agencies constituted an abuse of his authority.  ID at 29 (citing RAF, Tab 14 at 64).  In particular, the appellant disclosed that, during a conversation with her, A.J. referred to a female HHS employee as "Bart Simpson," and referred to the FBI as the "Honolulu field office."[11]  ID at 29 (citing RAF, Tab 14 at 62-63).  Again, although A.J.'s remarks may have been unprofessional, a disinterested observer could not reasonably conclude that they constituted an abuse of his authority.

¶18      Regarding disclosure (4), that the HFO had an excessive utility bill because of A.J.'s decision to designate the HFO a 24-hour per day operation and run the utilities around the clock, we agree with the administrative judge that the appellant failed to prove by preponderant evidence that a reasonable person would believe that this decision constituted gross mismanagement or resulted in a gross waste of funds.  ID at 19-20.  "Gross mismanagement" is more than de minimis wrongdoing or negligence; it means a management action or inaction that creates a substantial risk of significant adverse impact on the agency's ability to accomplish its mission.  *See Cassidy v. Department of Justice*, 118 M.S.P.R. 74, ¶ 8 (2012).  It does not include management decisions that are merely debatable.  *See Johnson v. Department of Justice*, 104 M.S.P.R. 624, ¶ 16 (2007).  Likewise, the Board has defined a gross waste of funds as "a more than debatable expenditure that is significantly out of proportion to the benefit reasonably expected to accrue to the government."  *MaGowan v. Environmental Protection Agency*, 119 M.S.P.R. 9, ¶ 7 (2012) (quoting *Downing v. Department of Labor*, 98 M.S.P.R. 64, ¶ 11 (2004), *aff'd*, 162 F. App'x 993 (Fed. Cir. 2006)).

---

[11] The transcript of the appellant's July 20, 2013 deposition indicates that she reported that A.J. referred to the FBI as the "Honolulu field office."  RAF, Tab 14 at 62-63.  In addressing disclosure (16) in her petition for review, however, the appellant alleges that A.J. referred to the FBI's Honolulu field office as the "Homolulu Office" because the female SAIC supposedly "lived non-traditional lifestyles."  PFR File, Tab 1 at 12.

¶19     Applying these standards, the administrative judge correctly found that the appellant's complaint about the HFO's utility bills did not disclose gross mismanagement because the decision to designate the office a round-the-clock operation, and thus incur higher utility bills, was a debatable management decision within A.J.'s discretion, and there were legitimate reasons for his decision. ID at 19-20. In that regard, the administrative judge noted the appellant acknowledged that sometimes employees had to work evenings and weekends, and that computer equipment was required to be stored at certain temperatures. ID at 19 (citing RAF, Tab 14 at 20-21; HT at 26).

¶20     As for whether the appellant's complaint about the utility bill constituted a protected disclosure of a gross waste of funds, we agree with the administrative judge that the expenditure was debatable because the higher bill was based on A.J.'s decision to designate the office a "24/7 operation"—a decision that was within his discretion and that he had legitimate reasons for making. ID at 19. Moreover, in light of the fact that HFO employees were sometimes required to work in the evenings and on weekends, and computers were required to be stored at certain temperatures, this expenditure was not "significantly out of proportion" to the benefit reasonably expected to accrue to the government. Thus, we agree with the administrative judge's finding that the higher cost did not reflect a gross waste of funds. ID at 19. Therefore, we find that the appellant did not prove that disclosure (4) was a protected disclosure.

¶21     Regarding disclosure (5), that A.J. placed a performance expectation letter in an SA's personnel file without having the letter approved by the Secret Service's employee relations branch, the administrative judge found that the appellant did not prove that a reasonable person would believe this situation resulted in a violation of a law, rule, or regulation, or any other category of wrongdoing. ID at 20. In making this finding, the administrative judge noted that M.M. testified that an SAIC "certainly" has the authority to place a reprimand or letter of counseling in an employee's file, ID at 20 (citing HT at

194), and that the appellant cited no law, rule, or regulation requiring that the employee relations branch approve the performance expectation letter at issue, ID at 20. Instead, the appellant testified that it was merely her "understanding" that the process must be coordinated with employee relations. ID at 20 (citing HT at 27-28). In addition, the administrative judge noted that the appellant acknowledged that she was unaware of whether A.J. had discussed the letter with employee relations. ID at 20.

¶22 We agree with the administrative judge that the appellant failed to prove that this disclosure was protected. To make a protected disclosure of a violation of law, rule, or regulation, an employee must identify the specific law, rule, or regulation that was violated. *Langer v. Department of the Treasury*, 265 F.3d 1259, 1266 (Fed. Cir. 2001). Although an individual need not identify a statutory or regulatory provision by particular title or number when the statements and circumstances surrounding the making of those statements clearly implicate an identifiable violation of law, rule, or regulation, *id.*, disclosure (5) falls short of this broad standard. Further, a disinterested observer could not reasonably conclude that this disclosure evidenced any other category of wrongdoing listed in 5 U.S.C. § 2302(b)(8).

¶23 Regarding disclosure (6), that the Secret Service paid for A.J.'s membership in a private gym, as previously noted, the appellant informed the fact-finders that the HFO had 10 revolving memberships at a private gym even though there was a gym at the HFO. IAF1, Tab 8, Vol. 6, Agency File, Part 4 at 43. We agree with the administrative judge that the private gym memberships were not a gross waste of funds, nor did they evidence an abuse of authority or gross mismanagement. ID at 20-21. As the appellant acknowledged during her hearing testimony, SAs are required to meet physical fitness standards, the private gym had facilities in locations within the HFO's jurisdiction that SAs could use during foreign travel, and the 10 memberships cost a total of about $5,000.00 per year. HT at 29-31. Given these circumstances, the expenditure on the gym memberships was not

"significantly out of proportion to the benefit reasonably expected to accrue to the government" and, thus, we find that it was not a gross waste of funds.

¶24 We also agree with the administrative judge that, as SAIC of the HFO, A.J. had the discretion to obligate the gym memberships and that the appellant simply disagreed with A.J. about the value of having such memberships when there was a gym available to HFO employees at no charge. ID at 21. Thus, a disinterested observer with knowledge of the facts known to the appellant could not reasonably believe that the gym memberships evidenced an abuse of authority or gross mismanagement.

¶25 Disclosures (7)-(9) involve A.J.'s decisions not to obtain the following equipment and resources for the HFO: search warrant breaching tools (disclosure (7)); access to Hawaii DMV records (disclosure (8)); and police lights and sirens for the 10 GOVs in the HFO's fleet without them (disclosure (9)). The appellant's disclosures do not reveal anything more than the questioning of management decisions that are merely debatable. Therefore, we agree with the administrative judge that a reasonable person could not find that the decisions described in these disclosures constituted gross management.

¶26 We also agree with the administrative judge that these disclosures did not evidence a danger to public safety. Disclosures regarding danger to the public must be both substantial and specific to be protected. *Miller v. Department of Homeland Security*, 111 M.S.P.R. 312, ¶ 6 (2009). Factors to be considered in determining if a disclosed danger is sufficiently substantial and specific to be protected include the likelihood of harm, when the alleged harm may occur, and the potential consequences of the harm. *Id.* Disclosure of an imminent event is protected, but disclosure of a speculative danger is not. *Id.*

¶27 Regarding the breaching tools, the administrative judge noted that M.M. testified that SAs worked with local law enforcement in executing search warrants when breaching tools were necessary, and local police usually had such tools. ID at 22 (citing HT at 234-35). Similarly, the appellant acknowledged in

her testimony that on the two occasions when agents in the HFO needed breaching tools, they borrowed them from another agency and successfully executed the search warrants. HT at 33. In light of this testimony, we agree with the administrative judge that the appellant, at most, disclosed a speculative danger with little likelihood of harm. ID at 22-23. Thus, we find that disclosure (7) was not protected as a disclosure of a danger to public safety.

¶28    We also agree with the administrative judge that the appellant's complaint regarding the lack of lights and sirens on 10 GOVs in the HFO's fleet (disclosure (9)), at most, disclosed a speculative danger. ID at 24. As the administrative judge noted, the appellant acknowledged that emergencies were not routine and she provided no information identifying a substantial and specific danger that could result from not having every GOV equipped with lights and sirens. ID at 24 (citing HT at 36). Thus, we find that this disclosure was not protected as a disclosure of a danger to public safety.

¶29    Regarding disclosure (10), that the geographic boundaries of the Secret Service's districts required reevaluation because the Honolulu district is too large, thereby resulting in excessive travel expenses, the purchase of business-class airline tickets, and excessive overtime expenses, we agree with the administrative judge that this complaint was not a protected disclosure. ID at 25-26. In making this finding, the administrative judge noted that the decision regarding how best to define the geographic boundaries of the agency's districts was within the discretion of agency officials overseeing the agency's operations on a global scale. ID at 25. Although the appellant disagreed with the way in which the districts were defined, she did not show that a disinterested observer could reasonably believe that the way in which the agency defined its geographic districts created a substantial risk of adverse impact on the agency's ability to accomplish its mission, or evidenced any other category of wrongdoing set forth in 5 U.S.C. § 2302(b)(8). Further, it is unclear, and the appellant does not

explain, how the size of the Honolulu district resulted in the purchase of business-class airline tickets.

¶30     Regarding disclosure (12), that the HFO's administrative personnel were not properly cross-trained, the administrative judge found that a reasonable person could not believe the lack of cross-training evidenced a violation of a law, rule, or regulation, an abuse of authority, or gross mismanagement. ID at 27. Rather, the administrative judge found that the appellant pointed out inefficiencies and suggested improving the functioning of the office by cross-training the administrative staff. ID at 27. We agree with the administrative judge. Although the failure to cross-train the HFO's administrative personnel arguably reduced the HFO's efficiency, the appellant did not prove that a disinterested observer could reasonably believe that the lack of cross-training created a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission. Consequently, we find that the appellant's complaint about lack of cross-training among the HFO's administrative personnel was not a protected disclosure of gross mismanagement, nor was it a protected disclosure of any other category of wrongdoing identified in 5 U.S.C. § 2302(b)(8).

¶31     Regarding disclosure (15), that A.J. allowed FSNs working for the Secret Service's offices in Hong Kong and Bangkok to use GOVs for their HTW transportation, the administrative judge found that the appellant did not prove that she reasonably believed that allowing FSNs to use GOVs violated a law, rule, or regulation, or evidenced any other category of wrongdoing. ID at 29. The statutory provision governing the use of GOVs for HTW transportation, 31 U.S.C. § 1344, generally prohibits such use unless it is for an "official purpose."[12] The Secret Service's policy governing the use of GOVs for HTW

[12] Pursuant to 31 U.S.C. § 1344(a)(2), HTW transportation, when approved in writing by an agency head, is for an official purpose when such transportation is: (A) required for the performance of field work, or (B) essential for the safe and efficient

transportation—the HTW Transportation Determination Plan—is set forth in Agency Directive Section AOD-04(03) of the Secret Service's Administrative Manual [AOD-04(03)], entitled "Home To Work Driving Authority." *See* IAF2, Tab 16, Vol. 5 at 410-18. The plan, which was approved by the Secretary of the Treasury, authorizes the use of GOVs for HTW transportation by designated personnel in specific categories, including employees designated for off-duty or emergency response, such as physical security specialists and structural engineers. *Id.* at 410-11.

¶32 In support of her finding that this disclosure was not protected, the administrative judge noted the following: M.M. testified that FSNs were designated as off-duty or emergency response personnel within the meaning of the policy, ID at 29; the appellant acknowledged during her testimony that the FSNs might have to assist Secret Service employees by responding to emergency situations, ID at 28-29 (citing HT at 44-45); and when the appellant brought the issue to A.J.'s attention, he explained that the FSNs' use of the vehicles was in full compliance with policy, and had been approved by the INV, ID at 28 (citing IAF1, Tab 5, Vol. 3 at 240, 317; IAF2, Tab 16, Vol. 5 at 425).

¶33 Under the statute, however, the test for a protected disclosure is whether the appellant had a reasonable belief that she was disclosing a violation of law, rule, or regulation when she made the disclosure, not in light of events or conversations occurring thereafter. *See Webb*, 122 M.S.P.R. 248, ¶ 13 (citing 5 U.S.C. § 2302(b)(8)). The record shows that A.J. did not notify the appellant that the FSNs' use of the vehicles was in full compliance with agency policy and had been approved by the INV until January 9, 2009, i.e., 4 days after she made this disclosure during her interview with the fact-finders. *See* IAF1, Tab 5, Vol. 3 at 240, Tab 8, Vol. 6, Agency File, Part 4 at 42, 45. Thus, it appears that the appellant was not aware of this information at the time of her disclosure.

---

performance of intelligence, counterintelligence, protective services, or criminal law enforcement duties.

¶34 Moreover, AOD-04(03) states that the policy governing the use of GOVs for HTW transportation applies to all employees and offices of the Secret Service. *See* IAF2, Tab 16, Vol. 5 at 410. Although the appellant acknowledged during the hearing that FSNs might have to assist Secret Service employees by responding to emergency situations, *see* HT at 44-45, she also testified that she believed FSNs were either employees or contract employees of the State Department, i.e., not the Secret Service. *Id.* at 44. In light of this testimony, the scope of the agency policy governing the use of GOVs for HTW transportation, and the evidence indicating that the appellant was not informed until after her disclosure that the INV had approved the FSNs' use of GOVS for HTW transportation, we find that the appellant reasonably believed that the use of GOVs for HTW transportation by the FSNs in Hong Kong and Bangkok was a violation of law, rule, or regulation. Accordingly, we find that disclosure (15) was protected and modify the initial decision regarding this matter.

<u>The appellant's disclosures were a contributing factor in the personnel actions.</u>

¶35 To prevail in an IRA appeal before the Board, an appellant must prove by preponderant evidence that her disclosure was a contributing factor in a personnel action. *Chavez*, 120 M.S.P.R. 285, ¶ 27. The term "contributing factor" means any disclosure that affects an agency's decision to threaten, propose, take, or not take a personnel action with respect to the individual making the disclosure. *Usharauli v. Department of Health & Human Services*, 116 M.S.P.R. 383, ¶ 31 (2011); 5 C.F.R. § 1209.4(c). The most common way of proving the contributing factor element is the "knowledge/timing test." *Chavez*, 120 M.S.P.R. 285, ¶ 27. Under that test, an appellant can prove that her disclosure was a contributing factor in a personnel action through evidence that the official taking the personnel action knew of the whistleblowing disclosure and took the personnel action within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. *Id.* Once an appellant has satisfied the knowledge/timing test, she has demonstrated that a

protected disclosure was a contributing factor in a personnel action. *Gonzalez v. Department of Transportation*, [109 M.S.P.R. 250](#), ¶ 20 (2008).

¶36    Regarding the knowledge prong of the knowledge/timing test, the record reflects that at least two agency officials involved in the selections at issue in these appeals[13] were aware of the appellant's whistleblowing disclosures and/or protected activities.  Specifically, P.M. was a member of the board and, for two of the selections at issue in this appeal (the December 2011 selections for the London RAIC and Rome ASAIC positions), C.M. represented an AD on the board because that AD was unavailable at that time.  IAF1, Tab 8, Vol. 6, Agency File, Part 3 at 102-03; HT at 75-76.  As the administrative judge found, P.M. was aware of the appellant's disclosures and her grievance, in which she alleged reprisal for those disclosures, because he was the agency official who denied her grievance.  ID at 32 (citing IAF1, Tab 5, Vol. 4 at 505); *see* IAF1, Tab 5, Vol. 2

---

[13] As explained in the initial decision, the selection process for the positions at issue in these appeals involved either an advisory board (for the GS-15 lateral assignments) or the Executive Resources Board (for the SES positions).  *See* ID at 7-8.  Both boards were comprised of the Secret Service's Deputy Director, Chief of Staff, and the ADs for its eight directorates.  ID at 7, 8 n.6 (citing HT at 130, 335-36).  Because the advisory board and the Executive Resources Board were comprised of the same members, we will refer to both boards interchangeably as the board, as the administrative judge did in the initial decision.  *See* ID at 8 n.6.  For GS-15 lateral reassignments, employees indicated their interest in an open assignment on the mainframe computer system, the AD of the office with responsibility over the vacancy recommended a candidate for consideration by the board, and, after discussing the recommended candidate and other candidates who had expressed an interest in the position, the board recommended a candidate for consideration by the Secret Service's Director and Deputy Director.  ID at 7 (citing HT at 63-64, 66, 76, 142-43; IAF1, Tab 5, Vol. 4 at 484; Tab 8, Vol. 6 at 115).  The Director could concur with the recommendation or select a candidate from a list of best qualified candidates.  ID at 7 (citing IAF1, Tab 8, Vol. 6 at 115).  For promotions from the GS-15 level to the SES level, the board made recommendations to the Director, who then made the final selection decision.  ID at 8.  For each of the GS-15 and SES selections at issue in these appeals, the Director concurred with the board's recommendations.  ID at 7-8.

Regarding the selection process for the 2012 DHS Fellows Program, as explained in the initial decision, the Secret Service did not select the participants for the program.  ID at 38.  Rather, the participants were selected by a panel of 13 managers from across DHS.  ID at 38 (citing IAF1, Tab 5, Vol. 3 at 366; HT at 433).

at 160-63. The administrative judge also correctly found that C.M. knew about the appellant's disclosures and protected activities because he received the written summary of the 2009 fact-finding investigation, which detailed the appellant's disclosures, he was the proposing and deciding official for the appellant's 1-day suspension, and he acknowledged during his testimony that he was aware of the appellant's OSC complaint and the Board appeal challenging her suspension. ID at 31-32 (citing HT at 86-87, 90); *see* IAF1, Tab 5, Vol. 2 at 129-31, 157-58.

¶37 Turning to the timing prong of the knowledge/timing test, the administrative judge found that the agency's nonselection decisions and other personnel actions occurred within a period of time such that a reasonable person could conclude that the disclosures were a contributing factor in the personnel actions. ID at 32 (citing *Redschlag v. Department of the Army*, 89 M.S.P.R. 589, ¶ 87 (2001) (finding that the appellant's disclosures were a contributing factor in her removal when they were made approximately 21 months prior).

¶38 We agree. As noted above, the appellant made her disclosures in January 2009, filed the grievance of her suspension in August 2009, and filed the IRA appeal challenging her suspension in December 2010. The first of the personnel actions at issue in these appeals, her reassignment to the Fusion Center, occurred in January 2010, and the first of the nonselections at issue occurred in December 2010, when her successor as ASAIC of the HFO was selected as SAIC of the HFO. *See* IAF1, Tab 5, Vol. 3 at 432. The Board has held that a personnel action taken within 1 to 2 years of a disclosure meets the timing element of the knowledge/timing test. *Ontivero v. Department of Homeland Security*, 117 M.S.P.R. 600, ¶ 23 (2012). Thus, we discern no reason to disturb the administrative judge's finding that the appellant has proven that her disclosures were a contributing factor in each personnel action at issue.

<u>The agency proved by clear and convincing evidence that it would have taken the same actions in the absence of the appellant's whistleblowing.</u>

¶39      Because the appellant met her burden to establish a prima facie case of whistleblowing, the burden shifted to the agency to prove by clear and convincing evidence that it would have taken the same personnel actions in the absence of her whistleblowing. *See Jenkins v. Environmental Protection Agency*, 118 M.S.P.R. 161, ¶ 16 (2012). In determining whether an agency has met this burden, the Board will consider the following factors: (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated. *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999); *Azbill v. Department of Homeland Security*, 105 M.S.P.R. 363, ¶ 17 (2007). Evidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record and despite the evidence that fairly detracts from that conclusion. *Whitmore v. Department of Labor*, 680 F.3d 1353, 1368 (Fed. Cir. 2012).

      *A. The strength of the agency's evidence in support of its actions.*

¶40      The Board has recognized that the first of the three *Carr* factors, set forth above, does not apply straightforwardly when, as here, the personnel action is not disciplinary and, therefore, does not require supporting evidence of misconduct. *See Azbill*, 105 M.S.P.R. 363, ¶ 18. As the administrative judge noted, in such circumstances, the Board considers the broader question of whether the agency had legitimate reasons for its action when addressing the strength of the agency's evidence in support of its action. ID at 33 (citing *Azbill*, 105 M.S.P.R. 363, ¶ 18, and *Gonzales v. Department of the Navy*, 101 M.S.P.R. 248, ¶ 12 (2006)).

¶41      Regarding the first *Carr* factor, the administrative judge found that the agency's evidence in support of its actions was strong. ID at 46. In making this

finding, the administrative judge considered the hearing testimony and documentary evidence regarding each of the personnel actions at issue in these appeals.[14] *See* ID at 33-46. The administrative judge found that agencies have wider latitude to use subjective criteria when filling managerial positions, especially at the SES level. ID at 46. The administrative judge concluded that, because the positions at issue are high-level leadership positions involving a great deal of discretion, trust, and responsibility, the agency's use of subjective criteria, such as leadership and interpersonal skills, does not detract from the strength of its evidence. *Id*.

¶42    The administrative judge further found that the agency explained in detail its reasons for selecting other candidates instead of the appellant, and that these reasons were legitimate. ID at 46. In that regard, the administrative judge noted that A.S., who was AD of the INV from January 2010 until April 2012, when he became Deputy Director of the Secret Service, testified that the appellant had a protection assignment with President Ronald Reagan, but she had no supervisory experience on a protective detail nor did she have any specialized skills, technical ability, or specialized computer skills, experience with an Electronic Crimes Task Force, or other cyber-related experience. ID at 46-47 (citing HT at 402-03); *see* ID at 35 (citing IAF1, Tab 5, Vol. 4 at 482, Tab 8, Vol. 6, Agency File, Part 3 at 5; HT at 368, 370)). In addition, the administrative judge noted that the board members had the following concerns about the appellant's ability to hold an SES position: (1) she did not manage agency employees in her position at the Fusion

---

[14] With the exception of the appellant's assignment to the Fusion Center, all of the personnel actions at issue in this appeal involve selection decisions; namely, the decisions not to select the appellant for various positions or for the 2012 DHS Fellows Program. Regarding the Fusion Center assignment, the administrative judge found that the agency proved by clear and convincing evidence that it would have reassigned the appellant to the Fusion Center even absent her protected disclosures, as the agency's action was in response to decisions that the appellant made for personal reasons, not in response to her whistleblowing. ID at 34. The appellant does not challenge this finding on review, and we see no reason to reexamine it.

Center; (2) she had declined a stepping stone position in headquarters[15]; and (3) she had "issues" while employed at the HFO. ID at 47.

¶43     As noted above, our reviewing court has provided guidance that a proper analysis of the clear and convincing evidence issue requires that all the evidence be weighed together; i.e., both the evidence that supports the agency's case and the evidence that detracts from it. *Whitmore*, 680 F.3d at 1368. Consistent with this guidance, the administrative judge here considered that the appellant's "issues" related at least in part to her complaints about A.J. and the HFO's Administrative Officer, which included her protected disclosures. ID at 47 (citing *Whitmore*, 680 F.3d at 1368). The administrative judge found, however, that the appellant's issues also included her inappropriate comments about A.J.'s age, her misuse of confidential funds, her discipline for those matters, and other information provided by HFO employees during the fact-finding investigation, which called into question her judgment and leadership skills. ID at 47 (citing IAF1, Tab 8, Vol. 6, Agency File, Part 4 at 42-75). In addition, as the administrative judge noted, the evidence showed that the agency's concerns regarding the appellant's management skills predated her protected disclosures and protected activities, as the appellant's supervisor documented his concerns with her interpersonal skills and diplomacy when dealing with employees in 2006-2007.[16] ID at 47 (citing IAF2, Tab 15 at 48 (page number generated by fax machine)). In sum, the administrative judge found little persuasive evidence suggesting that the appellant's protected disclosures or activities resulted in the

---

[15] In September 2012, P.M. offered the appellant the GS-15 position of DAD of the ADM, which the appellant declined for personal reasons. *See* IAF 1, Tab 5, Vol. 3 at 395. The person who occupied that position after the appellant declined it was promoted directly from that position to one of the SES appointments at issue. *See* IAF2, Tab 6 at 80.

[16] The appellant's supervisor during this time frame was the then-DAD of the Office of Protective Operations. *See* IAF2, Tab 15 at 48 (page number generated by fax machine).

concerns expressed by the board regarding her ability to manage people in a high-level management or executive position. ID at 47.

¶44 In assessing the strength of the agency's evidence, the administrative judge also considered the appellant's claim that the agency engaged in actions that showed a pattern of reprisal. *See* ID at 48-49. The actions cited by the appellant in support of this claim included the denial of her request to attend training events, ID at 48 (citing IAF1, Tab 5, Vol. 3 at 370), and the authorization of the fact-finding investigation which, she contended, did not conform to the Human Resources and Training Manual, Investigation of Alleged Employee Misconduct, ID at 49 (citing IAF2, Tab 21 at 16).

¶45 The administrative judge found that these events did not demonstrate a pattern of reprisal against the appellant. ID at 49. Rather, the administrative judge found that the record showed that the appellant was regarded as a valued employee. ID at 49. To that end, the administrative judge noted that, among other things, the agency awarded the appellant an assignment she requested in 2009, released her from that assignment at her request, assisted her in locating a GS-15 position in Honolulu, and offered her a position as DAD of the ADM in 2012. ID at 49.

¶46 Although the administrative judge did not make any explicit credibility determinations, she clearly credited the agency officials' testimony, regarding their reasons for selecting other candidates instead of the appellant, by finding that those reasons were legitimate and that the agency's evidence in support of its selection decisions was strong. *See* ID at 46. The appellant challenges these implied credibility findings on review, alleging that, during their testimony, agency officials "made stories" about their reasons for recommending other candidates instead of her and made statements about her that were untrue. *See generally* PFR File, Tab 1 at 13-19. In particular, the appellant alleges that A.S., who recommended the candidates who were ultimately selected for the London RAIC and Rome ASAIC positions in December 2011, "made stories" about why

he recommended those candidates, and she asserts that A.S.'s recommendations were "biased." *Id.* at 13-14. Similarly, she argues that M.M. and another selecting official, the TEC AD, "made stories" regarding why another candidate was selected for the SAIC-TSD position in August 2012. *Id.* at 15. She also alleges that, during his testimony regarding the selection for the SAIC-TSD position, M.M. "made a story" about her conduct during her tenure as the Paris Field Office (PFO) ASAIC when he stated that she was disruptive in the PFO and with foreign counterparts in Belgium. *Id.*

¶47        The Board will not disturb an administrative judge's findings when she considered the evidence as a whole, drew appropriate inferences, and made reasoned conclusions of credibility. *See Crosby v. U.S. Postal Service*, 74 M.S.P.R. 98, 105-06 (1997); *see also Broughton v. Department of Health & Human Services*, 33 M.S.P.R. 357, 359 (1987). The Board must give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing, and may overturn such determinations only when it has "sufficiently sound" reasons for doing so.[17] *Haebe v. Department of Justice*, 288 F.3d 1288, 1301 (Fed. Cir. 2002); *see McCarthy v. International Boundary & Water Commission*, 116 M.S.P.R. 594, ¶ 45 (2011) (in a whistleblower reprisal case, the Board is required to apply appropriate deference to an administrative judge's credibility findings consistent with the principles contained in *Haebe*), *aff'd*, 497 F. App'x 4 (Fed Cir. 2012).

¶48        The appellant has set forth no evidence to support her assertions or otherwise substantively challenge the administrative judge's implied credibility

---

[17] A noted above, the administrative judge did not make any explicit credibility determinations in the initial decision. A fortiori, she did not make any explicit demeanor-based credibility determinations. Nonetheless, she heard live testimony and her implied credibility determinations must be deemed to be at least implicitly based upon witness demeanor. *Little v. Department of Transportation*, 112 M.S.P.R. 224, ¶ 4 (2009).

findings. These assertions are thus mere disagreement with the administrative judge's implied credibility determinations and, as such, provide no basis to disturb the initial decision.

¶49 On review, the appellant also reasserts her argument from below that the January 2009 fact-finding investigation was improper because it did not comply with the Secret Service's manual regarding investigations of employee misconduct. PFR File, Tab 1 at 5; IAF2, Tab 21 at 16-17. She further asserts that no witnesses were placed under oath during the interviews conducted as part of the investigation, none of the interviews were recorded, no one was allowed to read the reports of the interviews, and there were no stated consequences for any untruthful information or statements. PFR File, Tab 1 at 6.

¶50 However, the record indicates that the appellant supported C.M.'s decision to conduct an investigation. *See* IAF1, Tab 5, Vol. 3 at 306 (December 19, 2008 email from the appellant thanking C.M. for his "arranging the 'fact finders'"). Although she is now clearly dissatisfied with the results of the investigation, her objections provide no reason to disturb the initial decision.

### B. Evidence of the agency's motive to retaliate.

¶51 Turning to the second *Carr* factor—the existence and strength of any retaliatory motive on the part of the officials who were involved in the decision in question—the administrative judge noted that there were multiple agency officials who testified that the appellant's whistleblowing did not allege wrongdoing on their part, did not implicate them, and they were not disciplined as a result of her disclosures. ID at 49 (citing HT at 97, 154-55, 279-80, 236, 323-24, 400-01, 424-25). The administrative judge found, however, that the appellant's whistleblowing did implicate these individuals to some extent, as they were high-level management officials of the Secret Service. ID at 49-50 (citing *Phillips v. Department of Transportation*, 113 M.S.P.R. 73, ¶ 23 (2010) (finding that comments generally critical of the agency's leadership would reflect poorly on officials responsible for monitoring the performance of the field staff and

making sure that agency regulations are carried out correctly and consistently)); *see Chambers*, [116 M.S.P.R. 17](), ¶ 69 (finding motive to retaliate because the appellant's disclosures reflected on the responsible agency officials as representatives of the general institutional interests of the agency). The administrative judge also noted that C.M. had issued the 1-day suspension that was the subject of both the appellant's first IRA appeal and her August 2009 grievance. ID at 50. Therefore, the administrative judge found that there was some motive to retaliate on the part of the agency officials involved in the selection decisions. ID at 50.

¶52      The administrative judge found, however, that A.J. seemed to be the individual with the most motive to retaliate because he was the subject of the appellant's disclosures and other complaints and, presumably, he was verbally counseled regarding some of those matters. ID at 50; *see* IAF1, Tab 5, Vol. 2 at 118-22. By contrast, the appellant's disclosures were not aimed at the agency's higher-level management officials who sat on the board, nor were they highly critical of the agency's leadership. ID at 50. Therefore, as the administrative judge found, although the board members and C.M. had some motive to retaliate based on their positions in leadership, they did not have a high level of motive to retaliate, as A.J. may have had. ID at 50. In addition, the administrative judge found that there was little evidence to support the appellant's claim that A.J. was a close personal friend of some of the board members, or that these purported friendships influenced the board's selection decisions. ID at 51.

¶53      On review, the appellant does not specifically address the administrative judge's findings that the agency officials involved in her selection decisions had some motive to retaliate, but that their motive was not as strong as that of A.J., nor does she challenge the administrative judge's findings that there was little evidence that A.J. influenced the board members in their selection decisions. Based on our examination of the record, we find no reason to disturb the administrative judge's findings regarding the second *Carr* factor.

*C. The agency's treatment of similarly-situated nonwhistleblowers.*

¶54    Regarding the third *Carr* factor, the administrative judge noted that there was little record evidence regarding the agency's treatment of similarly-situated nonwhistleblowers. ID at 51. This factor has obvious relevance when the action in question is a disciplinary action, i.e., when the appellant claims he was punished or punished more harshly than nonwhistleblowers who were not punished or punished more leniently. It has much less relevance when, as here, the contested action is a nonselection, as it would be highly unlikely that the selectee would also have made protected disclosures. Consequently, the third *Carr* factor is not a significant factor in our analysis.

¶55    The record reflects that the administrative judge in this case considered the relevant evidence as a whole under the *Whitmore* standard, made findings of fact and credibility determinations supported by the record, and concluded that the agency proved by clear and convincing evidence that it would have made the same selection decisions even in the absences of the appellant's protected disclosures. ID at 32-51. We find that the appellant has set forth no basis on review to disturb these findings.

The administrative judge did not abuse her discretion by denying the appellant's witness requests.

¶56    Although her argument is somewhat unclear, the appellant appears to contend on review that the administrative judge improperly denied her witness requests for two agency officials.[18] PFR File, Tab 1 at 9, 17; *see* IAF2, Tab 14 at 7-8, 25, 30-31. We disagree. An administrative judge has wide discretion to control the proceedings, including the authority to exclude testimony he believes would be irrelevant, immaterial, or unduly repetitious. *Sanders v. Social Security*

---

[18] The appellant also seems to assert that two other individuals should have been allowed as witnesses. *See* PFR File, Tab 1 at 14, 16. However, the appellant's apparent contention that these individuals should have been allowed to testify is unavailing because the appellant did not request either of them as a witness during the proceedings below.

*Administration*, [114 M.S.P.R. 487](), ¶ 10 (2010). The Board will not disturb an administrative judge's decision to deny a party's proposed witnesses unless such denial constitutes an abuse of discretion. *Dangerfield v. U.S. Postal Service*, [77 M.S.P.R. 678](), 684-85 (1998). The administrative judge disapproved these agency officials as witnesses based on her finding that they did not appear to have testimony that was relevant to the accepted issues and/or their testimony appeared to be duplicative of other witnesses. IAF2, Tab 26 at 1. We discern no abuse of discretion by the administrative judge in denying the appellant's witness requests for those reasons. In any event, the appellant did not timely object to the administrative judge's ruling denying these agency officials as witnesses and, therefore, is precluded from doing so on review. *See Tarpley v. U.S. Postal Service*, [37 M.S.P.R. 579](), 581 (1988).

## NOTICE TO THE APPELLANT REGARDING
## YOUR FURTHER REVIEW RIGHTS

The initial decision, as supplemented by this Final Order, constitutes the Board's final decision in this matter. [5 C.F.R. § 1201.113](). You have the right to request further review of this final decision. There are several options for further review set forth in the paragraphs below. You may choose only one of these options, and once you elect to pursue one of the avenues of review set forth below, you may be precluded from pursuing any other avenue of review.

Discrimination Claims:  Administrative Review

You may request review of this final decision on your discrimination claims by the Equal Employment Opportunity Commission (EEOC). *See* Title 5 of the United States Code, section 7702(b)(1) ([5 U.S.C. § 7702](b)(1)). If you submit your request by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit your request via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, NE
Suite 5SW12G
Washington, D.C. 20507

You should send your request to EEOC no later than 30 calendar days after your receipt of this order. If you have a representative in this case, and your representative receives this order before you do, then you must file with EEOC no later than 30 calendar days after receipt by your representative. If you choose to file, be very careful to file on time.

Discrimination and Other Claims:  Judicial Action

If you do not request EEOC to review this final decision on your discrimination claims, you may file a civil action against the agency on both your discrimination claims and your other claims in an appropriate United States district court. *See* 5 U.S.C. § 7703(b)(2). You must file your civil action with the district court no later than 30 calendar days after your receipt of this order. If you have a representative in this case, and your representative receives this order before you do, then you must file with the district court no later than 30 calendar days after receipt by your representative. If you choose to file, be very careful to file on time. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Other Claims:  Judicial Review

If you do not want to request review of this final decision concerning your discrimination claims, but you do want to request review of the Board's decision

without regard to your discrimination claims, you may request review of this final decision on the other issues in your appeal by the United States Court of Appeals for the Federal Circuit.

The court must receive your request for review no later than 60 calendar days after the date of this order. *See* 5 U.S.C. § 7703(b)(1)(A) (as rev. eff. Dec. 27, 2012). If you choose to file, be very careful to file on time. The court has held that normally it does not have the authority to waive this statutory deadline and that filings that do not comply with the deadline must be dismissed. *See Pinat v. Office of Personnel Management*, 931 F.2d 1544 (Fed. Cir. 1991).

If you want to request review of the Board's decision concerning your claims of prohibited personnel practices described in 5 U.S.C. § 2302(b)(8), (b)(9)(A)(i), (b)(9)(B), (b)(9)(C), or (b)(9)(D), but you do not want to challenge the Board's disposition of any other claims of prohibited personnel practices, you may request review of this final decision by the United States Court of Appeals for the Federal Circuit or by any court of appeals of competent jurisdiction. The court of appeals must receive your petition for review within 60 days after the date of this order. *See* 5 U.S.C. § 7703(b)(1)(B) (as rev. eff. Dec. 27, 2012). If you choose to file, be very careful to file on time.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703) (as rev. eff. Dec. 27, 2012). You may read this law as well as other sections of the United States Code, at our website, http://www.mspb.gov/appeals/uscode/htm. Additional information about the United States Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11. Additional information about other courts of appeals can be found at their

respective websites, which can be accessed through http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.


FOR THE BOARD:                    _____
                                  William D. Spencer
                                  Clerk of the Board

Washington, D.C.